Good morning, Justices. My name is Alan Martini, and I represent the appellant in this case, FCE Benefits. Now, FCE Benefits is a third-party administrator providing administrative services to various group insurance plans. The insured had insurance coverage under an errors and omissions policy, which it renewed on June 6, 2017. Up to that time, they had $3 million per claim coverage. But on that date, going forward, they increased the limits, per claim limits, to $5 million. So the policy read that claims that were, by reason of errors and omissions before that date, were still covered under the $3 million prior limit. But claims going forward in the future would be covered up to an additional $5 million limit for errors and omissions committed after that date. The policy provided that for any claims based exclusively on errors and omissions occurring after June 6, 2017, would be subject to this $5 million limit. At the time, FCE had contracts with its various clients under which it provided third-party administrative services. In 2018, one of its clients sued via arbitration, FCE, for various errors and omissions. And the petition for arbitration listed a number of errors and omissions, or acts and omissions, without specifying when they occurred. So a reasonable insured under this policy would expect that claims that were based on errors and omissions before they renewed this policy would be subject to a $3 million limit. But if they committed errors and omissions thereafter, it would be subject to the $5 million limit. No reasonable insured would understand that these separate claims, in this case, arose out of related facts. So can you elaborate on that? I mean, how do you see this not as falling within the multiple claims provision? There's two answers to that. Number one is, I don't believe the multiple claims provision is intended to even apply to the situation of determining things like exclusions or limits, as indicated in the Health Net case, number one. But number two, here, there were general allegations of wrongdoing. The first one, the claimants sought reimbursement of expenses that they incurred in connection with some other lawsuit in another, actually another circuit. Counsel, could we look at the two provisions that are at issue here, E1A and E1B? Would you agree that those are the two provisions that we should look at to resolve this issue? Yes. Okay. So the first one says, for any claim by reason of an actual or alleged act or omission committed prior to June 6, 2017, then the limit is $3 million, correct? That's correct. Okay. So for any claim based exclusively on acts or omissions, including personal injury, committed on or after June 6, 2017, exclusively, right? Correct. So are you asserting that any of these claims were based exclusively on acts or omissions committed on or after June 6, 2017? The — That's a yes or no answer. Yes. Which acts, which claim is based exclusively on acts committed on or after June 2016? They all are potentially — No, no. It has to be exclusively based on acts occurring after June 6, 2017. Right. Exclusively. It can't be some. It has to be all. Any — well, if these are separate claims, then you have to look at any particular separate claim, and we don't know when the error or omission occurred. It's not indicated in the Petition for Arbitration. Well, if it's not indicated, then that means you can't show it was exclusively after June 6, 2017. So our position is that the insurance carrier, Indian Harbor, has the burden to prove the application of their limit to a particular claim with regard to the duty to defend. So at the beginning of the case — It says that the insurer has the obligation to prove the limit of liability on a claim. What case says that? Well, I cited three. The Southern — What's your best case for the proposition? Southern California Pizza Company is on point on that. But there were — the Friedman case also applied a potentiality of coverage standard in determining what limit it was. Isn't that for the duty to defend? I mean, there was a defend. They did defend here, right? So we're just talking about the limits under the policy. We're talking about what the limits are for the duty to defend. Are they going to have to defend this petition for arbitration or these particular claims up to $5 million or $3 million? That's a different question than potentiality for purposes of the duty to defend. They met the duty to defend. There's no question about that. They defended it. Now the issue is what is the extent of their liability for the defense that was provided. That's a different issue. They didn't defend in full because they haven't paid all of the defense costs that were incurred. That's a different point. They agreed to defend. They defended. They defended. They stopped paying. That's a different issue. Okay. But they did stop defending. They didn't defend the case to the end. They didn't pay for the defense costs. So I don't think there's any difference between determining initially whether there's a duty to defend or determining what the limits are for the duty to defend. That's absolutely different issues. Those are absolutely different issues. The duty to defend is whether they actually go into court or make a settlement, and then the issue becomes how much of that defense cost is covered under the policy. That's where we are now. How much of the defense cost is covered under the policy? There is no question regarding the duty to defend before us. Right. The issue is what limit applies to the duty to defend, and that is to be determined on a potentiality of coverage standard. I'm not sure that the cases say that. The potentiality of coverage is used in assessing whether or not there is a duty to defend. Those cases do not address what the limits are on the insurance policy in terms of how much has to be actually reimbursed. Well, if you look at it, a limitation is like an exclusion. So it's to be approached in the same way as determining whether there is a duty to defend in the first place. If there is a duty to defend up to the $5 million limits because it's possible that they would be triggered, the insurance carrier has to pay those defense costs. That's the problem with your argument. The cases don't say that. That's your argument, but your cases talk about potentiality in the context of deciding whether there is a duty to defend, not after the insurance company has defended. All right, but still in this case. Did they ever withdraw from the defense? They didn't pay the defense costs. No, they didn't withdraw from the defense, but at the end of the case they didn't pay all the defense costs that had been incurred before the end of the case. So you're talking actual legal fees or the judgment, the arbitral judgment? Legal fees. No, they didn't pay all the fees. That's acknowledged in this case. They didn't pay. I mean, that's what we're talking about in this case. That's what the issues are. Do they owe more fees? Yeah, they're saying they have paid to the limit. They said they paid to the limit and actually above the limit in defense costs, and you're saying they owe more. Right, even when they paid above the limit, they didn't pay all the defense costs. Well, they don't have an obligation to pay any defense costs that are not covered under the policy. That's correct. So we get back to the issue. Yep. So the arbitration's happened, right? It's done. Correct. So I'm unclear why we're talking about what potentially could be when we know what was, right? We know what happened in the arbitration. So what in the underlying claims that were arbitrated, were they not related such that they fell within the multiple claims provision? Because it seems that it's basically breach of a professional services agreement that has a lot of different mini-breaches, if you will, within that broader heading. From an indemnity standpoint, the case is over. So if we're going to look back and say what limit applies for indemnity, then you would use that approach. But even if we did, there is insufficient evidence here for the court to determine and to conclude that all of these various claims are related so that they'd be treated as one claim. Why were they brought together in one arbitration proceeding? Well, that's what plaintiffs do. When they have 18 claims, they bring all the claims. It's an issue that they're related, that they all were brought together in one proceeding and the evidence was admitted as to the failure to comply with the professional services obligations. But that doesn't make them one claim. Not one claim, related. All right. Well, maybe yes, maybe no, but it depends. Because here, we're talking about different damages, different events that happened. Some of them, you didn't report this to the Texas Department of Insurance. Another one, you didn't charge enough premium. But they're all under the umbrella of failure to perform the professional services as required. These are all different examples of how the company was derelict in its responsibility to provide these professional services. How it was manifested is all under the umbrella of the general claim of deficient performance. Correct? Yes, but I don't believe that you can be that general about it. You can have two separate claims in the same lawsuit that arise out of the same contract. Related to is very broad, though. Well, but it's not, it doesn't, it's got to be a reasonable relationship of some sort so that the insured would understand that there's going to be only the lower limit to a lawsuit that's brought where some claims are subject to the $5 million limit and some are free, that the $3 million limit would apply. For instance, the Friedman case talks about a doctor that performs malpractice and that that malpractice might be related to another tort that occurs during the surgery. But then they carved out and they said, but if, in addition to malpractice, the doctor touched the patient inappropriately for gratification, that would, it all happened in the same contract, it happened at the same time, but those would be separate claims because they're basically based on completely different rights. But we have more than that here. We don't even have one incident. We have incidents take place numerous times in performance of the contract. You could have a contractor get sued for breach of a remodel contract because they didn't cover the ceiling and it caused damage to the building and then later on they didn't compact the driveway and it cracked. You'd have two claims there that are not related. They just happen to have, you know, the same contractor did it, but, you know, under the same contract. But that's not really the test, whether it's under the same contract. You need to look at what the facts are underlying the claims. Counsel, Judge Gould, if I can interject a question. On the example you just gave of two errors by the contractor, are they related? They're separate claims, but are they related by the fact that both of them deal with malfeasance by the contractor? And why isn't that sufficient to make them related? There are different causes of action. There are different duties. There are different people performing those obligations. There's different damages. I don't believe they'd be related. I actually don't think that this provision even applies in this case because if you read the provision itself, the multiple claims provision, it applies to a determination of when is a claim made for purposes of the parties having a duty to provide notice, a duty to provide a defense, and things like that. This multiple claims provision says that two or more claims arising out of the same or related facts, et cetera, will be considered a single claim first made on the earliest of the date that such claim is made. It is there for the purpose of determining when is a claim first made. As the Health Net case points out, it's inappropriate to be using provisions like this in other aspects of the insurance policy, and as they point out, it would be absurd and be unreasonable if, in this case, one of the claims was subject to an exclusion and the others were not. But because they're related, the whole case would be excluded. That's not a reasonable result, and that's what Health Net says. And the same is true. The policy limits shouldn't be treated differently than a policy exclusion. This language isn't designed for this purpose. It's for determining when a claim was made, and that's true. If they're related and the insured says there's two different claims for purposes of two different policies, I mean, in other words, they want two policies to be triggered or they want several limits, which we're not claiming in this case, to be applied, then that language would come into play. And if they're related, no, you just get one limit. This is all we're saying. We only get one limit. And, you know, the claim was made at the earliest, when the earliest notice was provided. I believe that the SoCalPizza case does say that the potentiality of coverage standard is applied to determine the insurer's limits for the duty to defend. I didn't say that very well. But in that case, because there was a $250,000 limit that the court said doesn't apply to the defense duty because it's possible that another limit might apply. Counsel, do you want to save some time for reporting? Yes, thank you so much, Your Honor. All right. Good morning, Your Honors. Katherine Ashton, Clyde & Co., San Francisco, appearing on behalf of Defendant Annapolis Indian Harbor. As Your Honor has correctly pointed out, this is not a question about whether Indian Harbor defended FCE in the underlying arbitration. And the cases that counsel relies upon, particularly the bus case, but all of his cases, generally are ascertaining whether the carrier breached the duty to defend because they failed to recognize that there's a potential for coverage. And when that happens, the carrier assumes the defense. And if the carrier disclaims the defense, that's a breach of the policy. Here, Indian Harbor defended. And what counsel has not addressed, and I think, Judge Bress, you pointed this out, under California law, particularly the bus case, the Aerojet case, there is a temporal limit of the duty to defend. The temporal limit of the duty to defend arises upon tender. Here, that's March 20th, 2018. And it ends when the underlying action concludes. And here, the underlying action concluded when the Seventh Circuit affirmed the judgment against FCE. That occurred July 28th of 2020. At that time, Indian Harbor was still paying the defense invoices that were submitted by FCE. Those defense invoices, which are undisputed, was $2.2 million to FCE's defense counsel. Are there any defense costs that were not reimbursed here? Your Honor, there were defense costs that were not reimbursed. And I added into the record the defense costs. We received a letter from Mr. Martini claiming about $425,000 unreimbursed defense costs. And that was addressed, first off, there were defense costs that were not paid because they were pre-tender. And under California law, there's no duty to pay defense costs pre-tender. And with respect to the other claimed unpaid defense costs, they actually were paid. So setting aside whether there actually are any unpaid defense costs, the material point here is that Indian Harbor paid over the $3 million limit. And that $3 million is inclusive of defense costs? That's correct. And as you may notice on the underlying record, a large portion of FCE's briefing was to argue that this professional liability policy was like a general liability policy where defense costs are in addition. It was very plain that both defense expenses and any damages are within that $3 million limit. Judge Breyer did not agree, and it's a plain reading of the policy. It was within the $3 million limit. And as Ms. Marcucci's declaration showed, it was during this litigation that she realized her error, that an $850,000 wire payment had not been recorded under the policy, and therefore there was an overpayment. So in this case, you claim there's a $3 million limit. You paid roughly $2.2 million in defense costs, and then everything north of that that you paid was to satisfy to go towards the arbitral award? Correct. That was paid, I think it was around August after the award was affirmed on appeal. So there was no more money to be paid under the policy. The policy exhausted. And again, as we put into the supplemental record, that's why we reached out to counsel and said we realized there was an overpayment we'd like to amend and seek reimbursement of that overpayment. So why were the underlying claims in the arbitration related? Well, first off, they are arising from the same agreement. The two companies are actually related. They have one parent. They sued. I mean, it was in arbitration. If they were not related claims, it wouldn't have remained in arbitration. It would have been different. But it arose out of the same transaction in that it was handling how to administer these insurance policies. And again, FCE, they're sophisticated, insured, and they know how to read an insurance policy. And here, they were retained by the standard security companies to administer the insurance policies. And they didn't do it well. And that's what the underlying judgment was. And I think the most telling fact, which we put in the briefing, FCE only ever paid one retention, $75,000. They were never asked to pay more. And if their claim was multiple claims as they now contend, they would have had to pay more retentions for each claim. But they didn't. And in the Bay City's case, the California Supreme Court noted that they are not going to allow an insured to make an argument that they're entitled to more limits, but then also say they only have to pay one retention. You cannot have it both ways. They seem to be saying, we had the Department of Labor issue, we had the Texas issue, we've got some other issues, these are not related. How do you respond to that? Well, I respond to that to say, if the Department of Labor sued FCE, that would be a different claim. But those two claims were actually, Standard Security sued on those seeking reimbursement for what they had to pay. This entire arbitration proceeding related to Standard Security's unhappiness with how FCE discharged its obligations under that agreement, their professional agreement. The cases that we cited, they talked about... These are just categories of damages that flowed from essentially a common breach of duty? These are a category of damages in that these are professional services. FCE was retained to provide administration services by one client. Their client sued them in arbitration because they weren't happy with how that was discharged. And that actually brings another important point, Your Honor, if I may say. I think FCE focuses largely on a causal relationship, and that's why they cited... I noticed the Freedman case and SoCalPizza, they focused on a causal relationship, but that's not the test under California law. Under the Bay City's case, and Freeman reiterates this, it's causal or logically related. So even if it's not causally related, there's no way to say these acts are not logically related because they all relate to the professional services and how they were discharged by the professional. And that's why they were sued and they were proceeding in arbitration and why there was a judgment subsequently to be paid. Who moved for the arbitration? Was that your client or did the parties agree to arbitration? I'm sorry, can you repeat that? Who moved for the arbitration? In other words, did they initiate the arbitration or did the... I'm sorry, the underlying clients in the arbitration? I'm trying to figure out whether FCE objected to the arbitration in any way. My recollection from the record is that the FCE's clients, Standard Security and Madison, they petitioned for arbitration. And I believe one of the grounds FCE asserted on appeal to the Seventh Circuit is that it shouldn't have been an arbitration and that was rejected. But at the time, did FCE object to arbitration? That I'm not aware of. And if I may, Your Honor, quickly just to go through, you asked for counsel's best case and they cite SoCalPizza. SoCalPizza is distinguishable, number one, because they're the insured denied providing any defense relying upon a wage and hour exclusion. The wage and hour exclusion, however, allowed for a $250,000 sublimit for defense expenses. So again, in reversing that, the court said the carrier had an obligation to demonstrate that the exclusion applied. And here we are dealing with policy limits, not exclusions. So it's distinguishable. And as Your Honor pointed out, FCE's arguing that it was Indian Harbor's duty to demonstrate the limit, but there's no case that holds or supports that. And SoCalPizza doesn't hold it. The HealthNet case also doesn't hold that. HealthNet also involved whether there was a duty to defend or a duty to pay based on an endorsement that was added to the policy. And although the court of appeal was a Justice Krosky opinion, they noted that it was a duty to defend policy, and therefore the carrier had an obligation to pay contemporaneous invoices as they went. So that case does not hold anything about what limits apply, as counsel is asserting that it does. And in that regard, too, Justice Breyer's order, he considered both scenarios. He said if the arbitral proceeding is one proceeding, it's one claim within the $3 million limit. However, if there are several claims within that proceeding, which is possible, they relate under the multiple claims provision. That's what that provision is intended to do, and that's what happened here. The provision is a timing provision and a scope provision. It relates related claims arising out of the same transactions into one claim, and then it places it as to a time when the first claim was made. So the multiple claims provision certainly does apply, and it's very telling that counsel's briefing below never once addressed that provision. So to come before the court and assert that Judge Breyer misconstrued it I think is a waiver issue, but it's also a bit disingenuous when you do not share your view of that provision to the district court below. So unless your honors have any other questions for me, Indian Harbor will submit. It appears not. Thank you, counsel. Thanks very much. Rebuttal. I would like to clear up one point about what this case is about. This case, I've said it before, is not about obtaining multiple policy limits where there might be multiple deductibles. That's not this case. We say there's one policy limit applicable to this case, and for the duty to defend it happens to be the $5 million limit. Now, let's just talk about one of these claims. This Chimes claim was a case by the Department of Labor in I think the Third Circuit, not that that matters, and the claim was that the claimants in this case incurred attorney's fees in responding to a discovery in that case. So how is that case related to the allegations in the other case, the underlying case, which have to do with the services provided to the insured? So that one is obviously not related, that claim. And as far as relation is concerned, none of these claims are developed sufficiently for a court to say they're related or not. They're not just plain related because they arise out of the same contract. Friedman says that. That's not enough. You can have separate claims arising out of one contractual relationship. And lastly, I'd just like to reiterate that this provision does not apply to exclusions or limitations. It's multiple policy. It's unreasonable and unfair. Thank you. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. That completes our calendar for today. We are in recess until 10 o'clock a.m. tomorrow morning. All rise.
judges: GOULD, RAWLINSON, BRESS